Present:  All the Justices

CSX                          TRANSPORTATION,                          INC.
                                              OPINION BY
v.  Record No. 950235        CHIEF JUSTICE HARRY L. CARRICO
                                              November 3, 1995
PATRICK W. CASALE

                    FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                           Theodore J. Markow, Judge

        This is the second time this FELA case has come before this

Court.[1]   On the first occasion, Patrick W. Casale (Casale),

recovered a $1.17 million judgment against his employer, CSX

Transportation, Inc. (CSX).   We reversed the judgment for the

trial court's error in permitting Casale's medical expert to state

that his diagnosis had been confirmed by the hearsay opinion of a

non-testifying physician.  CSX Transportation, Inc. v. Casale, 247

Va. 180, 182-83, 441 S.E.2d 212, 213-14 (1994).

        We remanded the case for a new trial limited to the issue of

damages, with the direction that "whatever verdict the plaintiff

may receive at a new trial shall be reduced by ten percent because

of the plaintiff's contributory negligence."   Id. at 186, 441

S.E.2d at 216.  Upon retrial, the jury returned a verdict in favor

of Casale for $2 million, which the trial court reduced to $1.8

million in accordance with our earlier direction.  We granted CSX

an appeal limited to the question whether the trial court erred in

admitting the testimony of an economist offered by Casale as an

expert on the subject of Casale's future loss of income.

        Casale was first employed by CSX in 1988 as a system

---

[1]FELA is an acronym for the Federal Employers'
Liability Act, 45 U.S.C. § 51 et seq.

maintainer, later becoming a communications maintainer. On February 20, 1990, he was working atop a sixty-foot pole repairing communication lines that crossed the Roanoke River in the vicinity of Weldon, North Carolina. Unexpectedly, a boat snagged a wire Casale was attempting to install, causing the pole on which he was working to whipsaw and slam him back and forth against the pole. As a result, Casale suffered a "chronic lumbosacral spine sprain," a "severe left sacro-iliac joint sprain," and "traumatic arthritis."

From the date of his injury to the time of the second trial, Casale was seen by approximately thirteen physicians, most of whom prescribed some type of treatment. Yet, Casale still suffered pain, discomfort, and depression at the time of trial. He walked with a limp and used a cane. His injured sacroiliac hip joint dislocated often, he had difficulty sitting for extended periods of time, his leg would give way on occasion, and he had problems sleeping. He continued to take medication, and he used various home remedies to relieve his discomfort. His injuries were concededly permanent.

During the four years and seven months from the date of his injury in February 1990 to the time of the second trial in September 1994, Casale missed 543 days from work, or more than 50% of the time he was supposed to be on the job. However, most of the time was lost in 1990, 1991, and the first nine months of 1992. In October of 1992, Casale's physician at the time reported that Casale could return to work after October 21 "with no limitations," and Casale lost no time from work during the

remainder of 1992. He lost only 18 days in 1993 and 35 days in the first eight months of 1994. From the time of the October 1992 report permitting Casale's return to work until the time of the second trial, he was not declared medically disqualified from employment with CSX.

At the time of the second trial, Casale was still employed by CSX as a communications maintainer, receiving $16.12 per hour in wages, although CSX had recently abolished his job involving work on poles because of reductions in personnel and advances in technology. As a result, Casale had sought and obtained assignment to CSX's radio repair shop in Rocky Mount, North Carolina. Casale had received training in Chicago for his new position and was scheduled to report for work on Monday, October 3, 1994, following the conclusion of the second trial on September 30, 1994.

At the second trial, Casale's counsel announced out of the presence of the jury that he intended to call Raymond Strangways, an economist, to testify concerning Casale's "lost income." Counsel told the court that when Strangways "filed his report with us he figured the lost income for some reason back to 1992 and into the future." Counsel further said that "[w]e advised [Strangways] . . . we did not want to go back to 1992, because Mr. Casale had been working" and that Strangways had revised his report to calculate Casale's loss "from today forward in the future."

CSX objected to what it calls Strangways' "lost future wages model" on the ground that the witness's testimony would be "based

on the fact that [Casale] is not working now, from now on, and all the evidence is that he is working." CSX stated that the court should not "allow [the witness] to testify to something that's based on [an incorrect] premise." The trial court overruled CSX's objection and admitted Strangways' testimony. Strangways then took the stand and testified that, at the direction of Casale's counsel, he had calculated Casale's future loss of income on the assumption that Casale either would not work at all after September 29, 1994, the day Strangways testified, or would work at a job paying only the minimum wage. On the assumption that Casale would "never . . . work again," Strangways calculated Casale's income loss "[s]tarting from today" at $997,000 were he to work until age 63, at $1,082,000 until age 65, and at $1,297,000 until age 70. On the assumption that Casale would "work in the future at a minimum wage job," Strangways calculated Casale's income loss at $679,000 were he to work until age 63, at $733,000 until age 65, and $866,000 until age 70.

CSX argues there was no evidence to support Strangways' assumption that, beginning with the day after Strangways testified, Casale would be permanently disabled from working for CSX or would only earn the minimum wage working for someone else. Hence, CSX concludes, the trial court should have ruled Strangways' testimony inadmissible.[2]

[2]CSX also argues on brief that Strangways' "lost future wages model" was further flawed because the evidence did not support the use of age 70 as the ending date for the calculation of Casale's loss of income. CSX correctly points out that Casale himself testified he intended to retire at age 65. However, because CSX did not timely object to Strangways' use of age 70, we will not consider

Casale argues on the other hand that "[t]here is evidence to support the assumption of Dr. Strangways that Casale would not be able to work for . . . CSX [after the date Strangways testified] and was unable to work for CSX at the time of trial." Furthermore, Casale says, "the calculations of Dr. Strangways were supported by specific medical and vocational evidence that Casale would never be able to do the radio shop job" in Rocky Mount, North Carolina. This job, Casale points out, required him to lift and install radios in CSX trains and vehicles and involved bending, stooping, crouching, and working in awkward positions. Therefore, Casale concludes, the trial court did not err in admitting Strangways' testimony.

Casale called as witnesses three physicians who testified concerning Casale's employment in CSX's radio repair shop in Rocky Mount. Dr. Michael Decker, a treating physician, testified that he would not "recommend" a job for Casale that involved lifting heavy objects, working in awkward positions, and reaching and bending. Dr. James Carr, another treating physician, stated that it was not "a good idea" for Casale to work in a job that requires him "to lift, carry, climb, stoop, crouch, [and] work in cramped or confined spaces." Dr. Arthur Wardell, an evaluating physician, said that it would not be within Casale's "abilities" to perform any work that required the lifting of heavy objects or involved bending over and getting into awkward positions.

(..continued)
the point. Rule 5:25. In any event, the ending date is immaterial in view of our holding <u>infra</u> that there was no basis for Strangways' use of the day after he testified as the beginning date of Casale's loss of income.

Casale also called Herman Bates, a vocational rehabilitation counselor, who made a vocational evaluation of Casale. Bates testified that the "work skills" Casale had developed at CSX were not transferable "into other areas" of employment and that, "should [Casale] be able to return to work" in alternative employment, it would be in a sedentary position paying the minimum wage.

There are several difficulties with Casale's position that "[t]here is evidence to support the assumption of Dr. Strangways that Casale would not be able to work for . . . CSX [after the date Strangways testified] and was unable to work for CSX at the time of trial." In the first place, while Casale wants this Court to accept the testimony of his medical witnesses and his vocational rehabilitation counselor to support his position, he testified himself that he did "have a job" and still "collected a paycheck" at the time of trial and that he had sought the job in CSX's Rocky Mount radio repair shop, had accepted training in preparation for the job, and intended to report for work in his new position on the Monday following the conclusion of the second trial.[3]

> As a general rule when two or more witnesses introduced by a party litigant vary in their statements of fact, such party has the right to ask the court or

---

[3]On brief, Casale says he made clear in his testimony he had "talked with a co-worker at the [Rocky Mount radio repair] shop and found that the job was more demanding than he expected and thus he had reservations about working full time five days a week eight hours a day." But even after testifying in this manner, Casale insisted that he planned to report to work on the Monday following the conclusion of the second trial.

jury to accept as true the statements most favorable to him. . . . This is not true, however, as to the testimony which he gives himself. No litigant can successfully ask a court or jury to believe that he has not told the truth. His statements of fact and the necessary inferences therefrom are binding upon him. He cannot be heard to ask that his case be made stronger than he makes it, where, as here, it depends upon facts within his own knowledge and as to which he has testified.

Massie v. Firmstone, 134 Va. 450, 462, 114 S.E. 652, 656 (1922).

Casale cannot ask that he be allowed to make his case stronger by having this Court accept the favorable evidence concerning his alleged inability to work while disregarding his own testimony that he was working at the time of the second trial and would report for work in his new job the first of the following week. These are facts within his own knowledge. He is bound by his testimony, and it tends to show that Strangways had no basis for his "lost future wages model." But there is more.

At different times during the course of the trial, the trial judge characterized Strangways' "lost future wages model" in terms that can only be described as disparaging. During the discussion on CSX's objection to Strangways' testimony, CSX's counsel argued that the testimony erroneously would be "based on the fact that [Casale is] no longer working." Responding, the trial judge indicated that if he were CSX's counsel, he would not object because it would be saying to the jury: "[W]e're going to give you this stuff and it's absolutely ridiculous. The man is still working today."

During a discussion on a request by Casale to use during closing argument a chart depicting Strangways' model, CSX's

counsel objected, stating: "[F]or [Casale] to use a visual display that's inaccurate is the problem." The trial judge responded: "It isn't accurate. It's based on an improper assumption." Then, when Casale's counsel asserted that the chart was "based on the evidence," the judge replied: "It is based on evidence, that is correct, but the evidence has been shown to be faulty." Finally, during argument on post-trial motions, the judge stated that he had "some concern with . . . the admissibility of Dr. Strangways' evidence [because] his assumptions are based on facts which are not in evidence."

These observations of the trial judge were eminently correct. Yet, he felt it was for the jury to determine whether a proper foundation had been laid for Strangways' testimony. We take a different view. In Swiney v. Overby, 237 Va. 231, 377 S.E.2d 372 (1989), a wrongful death action, the question was whether the trial court erred in admitting expert testimony regarding the stopping distance of one of the vehicles involved in an accident. In calculating the stopping distance, the experts used an assumed brake condition and speed of the vehicle in question. Interpreting Code § 8.01-401.1,[4] we held that admission of the

--------

[4]At the time Swiney was decided, Code § 8.01-401.1 read as follows:

> In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify. The facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence.

expert testimony was erroneous, stating:

> Qualification of an expert witness does not insure admission of his every statement and opinion. Code § 8.01-401.1 allows an expert to express an opinion without initially disclosing the basis for the opinion and to base the opinion on hearsay evidence otherwise inadmissible. It does not, however, relieve the court from its responsibility, when proper objection is made, to determine whether the factors required to be included in formulating the opinion were actually utilized. If all the factors are not utilized, the court should exclude the opinion evidence.

Id. at 233, 377 S.E.2d at 374 (citations omitted). And in Lawson v. John Doe, 239 Va. 477, 391 S.E.2d 333 (1990), another wrongful death case, the question was whether the trial court erred in excluding the testimony of an expert regarding the horizontal velocity needed for a board to slide along a pavement to the spot where it was found if it started its slide from a point near the location where a hat and shirt belonging to the deceased were discovered. In affirming the trial court's action, we said:

> Here, the plaintiff concedes, as, indeed, he must, that his expert would have had to assume that the board began its slide along the pavement "opposite the location of the hat and shirt." No evidence established that location as the beginning point of the board's slide, and only an assumption could have supplied this missing, essential factor.
>
> We do not read Code § 8.01-401.1 as sanctioning the

(..continued)

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

A 1994 amendment to Code § 8.01-401.1 pertains to the examination of experts concerning statements contained in published treatises, periodicals, or pamphlets on certain subjects. Acts 1994, c. 328. The amendment is inapposite here.

> admission of expert testimony based upon a mere assumption which, as here, has no evidentiary support. Hence the trial court did not err in excluding the proffered testimony.

Id. at 483, 391 S.E.2d at 336.

Furthermore, Code § 8.01-401.1 is based, with minor alterations, upon Federal Rules of Evidence 703 and 705, and we have held that "the construction given to those rules by the federal courts is instructive." McMunn v. Tatum, 237 Va. 558, 565, 379 S.E.2d 908, 911-12 (1989). In Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137 (4th Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 729 (1995), the district court admitted the testimony of an expert concerning construction methods and assessment of cost overruns on a building project, despite the objection that the expert did not have an adequate basis for his opinion. The district court held that if an expert does not have an adequate basis for his opinion, it is for counsel to bring out the deficiencies on cross-examination and for the jury to decide what weight, if any, the opinion should be given. Id. at 143.

> The Fourth Circuit Court of Appeals reversed, stating:
> It was an abuse of discretion for the trial court to admit [the expert's] testimony . . . . The court may not abdicate its responsibility to ensure that only properly admitted evidence is considered by the jury. Expert opinion evidence based on assumptions not supported by the record should be excluded.

Id.

In summary, the question before the trial court was one of the admissibility of evidence, not its weight -- a strictly legal question. It was for the trial court, therefore, not the jury, to decide whether the foundation had been laid for the introduction

of Strangways' testimony.  Since the evidence did not support the assumption upon which Strangways based his "lost future wages model," the trial court should have excluded the testimony.

As a last resort, Casale argues that if the admission of Strangways' testimony was erroneous, the error was harmless.  We disagree.  Strangways was the only expert economist to testify on the question of Casale's future loss of income, and his testimony was bound to have made a lasting impression on the jury.  The conclusion is inescapable that admission of the testimony was prejudicial to CSX.

For the error in admitting Strangways' testimony, we will reverse the judgment of the trial court and remand the case for a new trial, limited to the question of damages.  Again, we direct that whatever verdict Casale may receive at a new trial shall be reduced by ten percent because of his contributory negligence.

**Reversed and remanded**.