PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Lemons, JJ., and Carrico,[1] S.J.

NORFOLK AND WESTERN RAILWAY COMPANY

v. Record No. 020834      OPINION BY JUSTICE ELIZABETH B. LACY
                                        February 28, 2003
RAYMOND P. KEELING

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Clifford R. Weckstein, Judge

In this case brought under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 (FELA), Norfolk and Western Railway Company (N&W) appeals a judgment in favor of its employee, Raymond P. Keeling, Jr., asserting that Keeling failed to present evidence that N&W was negligent and that Keeling's injury was foreseeable. N&W also argues that the trial court improperly excluded certain expert testimony. Based on our review of the record, we conclude that the issues of negligence and foreseeability were properly submitted to the jury and that the trial court did not abuse its discretion in excluding the testimony of N&W's expert.

FACTS

Keeling was employed by N&W as an electrician. In his position, Keeling had to wear a respirator at times and, under federal regulations, was required to take pulmonary function tests (PFTs).

_____

[1] Chief Justice Carrico presided and participated in the hearing and decision of this case prior to the effective date

N&W contracted with T.K. Group, Inc., and Quality Services, Inc., to administer PFTs to N&W's employees. N&W's internal protocol provided that prior to administering a PFT

> the blood pressure of employee will be monitored and determined to be within the acceptable range (lower than 200/115). If above this level, testing will not be performed and the supervisor and medical doctor will be advised.

Before administering a PFT to Keeling in August 1994, N&W's agent, a technician employed through T.K. Group, Inc., and Quality Services, Inc., measured Keeling's blood pressure. That measurement showed that Keeling's blood pressure was greater than 200/110.[2] After waiting five or ten minutes, the technician again took Keeling's blood pressure, which then measured 158/102. Based on this reading, the technician proceeded to administer the test to Keeling.

The test required Keeling to breathe through a device that measures the airflow generated by the patient's lungs. The patient is instructed to inhale as deeply as possible and then exhale that air as quickly as possible. The technician administering the test felt Keeling's first test was insufficient and told Keeling to "blow hard" into the device again. When he repeated the test, Keeling started sweating

---

of his retirement on January 31, 2003.

[2] The record does not indicate the exact measured reading but established that Keeling's blood pressure was greater than 200/110.

and experiencing chest pain and dizziness.  At that point, the technician stopped further testing.  After checking with his superior, Keeling was driven home by a co-worker.

Keeling's symptoms continued at home, and his wife took him to a hospital emergency room.  The emergency room physician determined that Keeling had a hole in his ear and referred him to Dr. Kurt Chen, an otolaryngologist.  Dr. Chen performed surgery on Keeling's ear two days later.

Keeling's condition improved following his surgery and rehabilitation, but in 1995, he lost his balance and fell. Dr. Chen referred Keeling to Dr. Robert I. Kohut, another otolaryngologist, who diagnosed Keeling's condition as "recurrent perilymphatic fistula" and determined that Keeling required another surgery on his eardrum.[3]  Keeling experienced some improvement after this second surgery but was never released by a physician to return to his former employment.

Keeling filed an action against N&W under FELA, alleging that N&W violated FELA because it negligently failed to provide a safe workplace by, inter alia, not properly determining whether he was physically fit to undergo or

---

[3] A perilymphatic fistula is an opening between the inner ear and middle ear allowing perilymph fluid to permeate the middle ear from the inner ear.

3

continue pulmonary function testing.[4]  This negligence, Keeling

claimed, resulted in a perilymphatic fistula when he blew into

the testing mechanism.  Following a five day trial, the jury

returned a verdict in Keeling's favor for $350,000.  N&W

appeals from the judgment entered on the jury verdict.

DISCUSSION

1.  Negligence and Foreseeability

We awarded N&W an appeal on three assignments of error.

In its first two assignments, N&W asserts it was entitled to a

judgment in its favor as a matter of law because Keeling

presented no evidence of negligence in the administration of

the PFT and no evidence that Keeling's injury was foreseeable.

The legal principles applicable to these two assignments

of error are well settled.  Whether negligence has been

established in a FELA claim is a matter of federal law.

Norfolk S. Ry. v. Trimiew, 253 Va. 22, 24, 480 S.E.2d 104, 106

(1997).  Under FELA, the railroad has a nondelegable duty to

exercise reasonable care in providing a safe work place for

its employees.  Id. at 25, 480 S.E.2d at 106.  The employer

breaches this duty if its negligence causes, even in the

slightest way, an injury to its employee.  Reasonable

foreseeability of harm is an essential element of negligence

---

[4] Keeling also named T.K. Group, Inc. and Quality Services
Inc. as defendants.  Orders non-suiting T.K. Group and

4

under FELA. Id. at 24, 480 S.E.2d at 106. Both foreseeability and negligence must be shown by more than a scintilla of evidence, and these issues are normally issues for the jury. Id. at 27, 480 S.E.2d at 108.

The standard of review applicable to the first two assignments of error is also well established. The evidence and all inferences fairly made from that evidence must be considered in the light most favorable to Keeling. Austin v. Shoney's, Inc., 254 Va. 134, 138, 486 S.E.2d 285, 287 (1997). Further, this Court will not set aside the trial court's judgment unless it is plainly wrong or without evidence to support it. Code § 8.01-680.

N&W asserts that the record "simply does not support" Keeling's theory that the failure to excuse him from PFT testing when he received the initial higher blood pressure reading was negligent. N&W argues that Keeling was given the PFT only after his blood pressure reading was 158/102 and that there was no evidence to support the conclusion that administering a PFT following such a blood pressure reading was negligent. "The heart of" Keeling's allegation of negligence, N&W argues, is that the technician, N&W's agent, failed to follow N&W's internal protocol.

dismissing Quality Services were entered prior to trial.

The record does not support N&W's position. Rather, the record contains expert testimony that administering the PFT test following his initial blood pressure reading exposed Keeling to a greater risk of injury. Dr. Kirk E. Hippensteel, Keeling's expert in the field of pulmonology, testified that, in his expert medical opinion, no patient should be asked to perform a PFT following a blood pressure reading in excess of 200/110 or 200/115. Dr. Hippensteel explained that blood pressure is dynamic and that performing a PFT would likely cause a patient's blood pressure to increase. Such increase in blood pressure would decrease the autoregulation of the cardiovascular system and autoregulation of pressure in the brain. He opined that administering the PFT following the initial blood pressure reading in this case created the risk that Keeling's blood pressure, even following a rest period, would be as high or higher than the original blood pressure reading and that the test should not have been given.

This evidence of negligence in administering the test after receiving the initial higher blood pressure reading is not related to an allegation that the negligence consisted of a violation of N&W's internal protocol. Dr. Hippensteel's opinion is an independent determination that the initial blood pressure level itself, regardless of the relationship of that level to the protocol, provided the basis to conclude that the

PFT should not have been administered, regardless of subsequent blood pressure levels.

We conclude that the record contains more than a scintilla of evidence that N&W was negligent when its agents administered a stressful PFT test to an employee with a blood pressure reading in excess of 200/110 or 200/115. See Trimiew, 253 Va. at 27-28, 480 S.E.2d at 108.

We also agree with the trial court that sufficient evidence was produced to support a jury finding that injury was foreseeable as a result of administering the PFT under an elevated blood pressure level. An employee raising a FELA claim does not have to show that the employer's negligence would inevitably cause injury, had resulted in past injury, or would cause a specific kind of injury. See Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 120-21 (1963). N&W produced testimony that the blood pressure screening was done prior to administration of PFTs for general health purposes. Nevertheless, under N&W's protocol, the administration of a PFT was contingent upon an employee's blood pressure level. Thus, the jury was entitled to conclude that N&W believed there was a risk of harm associated with taking a PFT while experiencing certain blood pressure levels.

Considering the evidence in a light most favorable to Keeling, we conclude that Keeling presented more than a

scintilla of evidence that N&W knew or should have known that an injury was likely to occur if a PFT was given to an employee with a blood pressure level in excess of 200/110 or 200/115. Accordingly, the trial court properly submitted the issues of negligence and foreseeability to the jury and did not err in refusing to set aside the jury verdict on those issues.

## 2. Expert Testimony

N&W's final assignment of error relates to the testimony of Dr. J. Wallace Grant, Ph.D. We begin by briefly reviewing the testimony in question.

N&W offered Dr. Grant as an expert in biomechanical engineering with a specialization in vestibular mechanics. The trial court found that Dr. Grant was qualified to offer opinion testimony in those areas. In his direct examination, Dr. Grant was asked "what is it that causes one of these fistulas to become symptomatic?" As part of the response to this question, Dr. Grant stated that "[t]he creation of the fistula is usually the result of an infection or something that causes the tissue or the bone to deteriorate." Keeling objected, asserting that the questions and answers went beyond the area of biomechanical engineering because they addressed the medical cause of the fistula, an area "reserved for the medical profession."

Out of the presence of the jury, counsel for Keeling and N&W presented arguments regarding the admissibility of this testimony. Following a dialogue with the trial court as to whether N&W planned to ask Dr. Grant questions involving "cause," Dr. Grant was questioned further by N&W and Keeling. This questioning was submitted by N&W as a proffer of Dr. Grant's testimony. N&W's counsel summarized the testimony as describing "the relationship between blood pressure and cerebral spinal fluid as they interact in pressure within the vestibular area . . ." which "merely explains the mechanics of what goes about in the inner ear when there is a perilymphatic fistula which allows the communication of pressure between an inner ear and the middle ear."

Relying on Combs v. Norfolk and Western Railway Co., 256 Va. 490, 507 S.E.2d 355 (1998), the trial court concluded that Dr. Grant's testimony about the relationship between arterial blood pressure and perilymphatic fistula, was, in the court's view, "the functional equivalent of Doctor Schneck testifying to the relationship between various physical factors and the rupture of a human disk [in Combs]."

Following this ruling, N&W told the trial court that it intended to limit its questioning of Dr. Grant to "the relationship between blood pressure and the pressure that you see in the cerebral spinal fluid." The court proceeded to

9

examine Dr. Grant to determine whether the nature of his testimony would be biomedical or biomechanical. Following this exchange, the trial court again commented that the testimony at issue was "biophysical as well as biomechanical" and that N&W did not want to question Grant solely about "pressures in the inner ear." The trial court concluded that, under Combs, Grant could not "offer testimony in those areas." In its final assignment of error, N&W complains that because Dr. Grant's testimony did not address medical causation issues, it was error to exclude the testimony on the basis that Dr. Grant was not a medical doctor.

In considering questions of procedure and evidence, including the admissibility of expert testimony, we apply state law, Chesapeake v. Ohio Rwy. Co. v. Kelly, 241 U.S. 485, 491 (1916), and review the trial court's ruling to exclude expert testimony for an abuse of discretion. John v. Im, 263 Va. 315, 320, 559 S.E.2d 694, 696 (2002).

In Combs, we held that only a medical doctor could give expert testimony about the cause of a human physical injury. 256 Va. at 496, 507 S.E.2d at 358. We reiterated that rule in Im, 263 Va. at 321, 559 S.E.2d at 697. The testimony given by Dr. Grant in the presence of the jury – that fistulas were generally caused by infections that caused bone or tissue to deteriorate – clearly came within the prohibition recited in

10

Combs and Im.  The trial court did not abuse its discretion in excluding this testimony.

The testimony presented out of the presence of the jury in N&W's subsequent proffer did not include questions as to the cause of the fistula.  However, we cannot say that the trial court abused its discretion in disallowing this testimony based on its conclusions that N&W did not intend to limit its questions to pressure in the inner ear and that the proffered testimony involved opinions based on both medical and biomechanical matters.

Furthermore, as N&W predicted at trial and Keeling argues here, other medical doctors presented by N&W testified "essentially, about the same issues."  The testimony that N&W argues was improperly excluded was Dr. Grant's opinion that cerebral spinal fluid pressure is independent of arterial blood pressure and that a straining movement could increase both cerebral spinal fluid pressure and venous pressure but that there was no relationship between such a straining movement and arterial blood pressure.

Dr. Paul R. Lambert and Dr. C. Edward Rose, medical doctors testifying on behalf of N&W, stated that there was no relationship between arterial blood pressure and cerebral spinal fluid pressure.  These doctors also testified that a straining effort could increase cerebral spinal fluid pressure

and venous pressure but not arterial blood pressure.  This information was put before the jury, and, thus, Dr. Grant's testimony as to these matters would have been cumulative.

For the above reasons, we will affirm the judgment of the trial court.

<u>Affirmed.</u>