# Richmond

## ROLL 'R' WAY RINKS, INC. v. MICHAEL LESTER SMITH

September 1, 1977.

Record No. 760721.

Present: Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

*I. Lionel Hancock, III (Campbell, Lustig & Hancock,* on brief), for plaintiff in error.

*Guy E. Daugherty; Willis J. Spaulding (Howell, Anninos, Daugherty & Brown,* on brief), for defendant in error.

POFF, J., delivered the opinion of the Court.

Plaintiff Michael Lester Smith filed a motion for judgment seeking damages for injuries sustained in a fall at a roller skating rink operated by defendant Roll 'R' Way Rinks, Inc. Plaintiff alleged that defendant "permitted its premises . . . to be maintained in an improper condition and unsafe for the use of the public, and . . . negligently and carelessly failed to give the plaintiff any warning whatsoever of the aforesaid defect. . . ." By final order entered February 2, 1976, the trial court confirmed a jury verdict awarding plaintiff damages in the sum of $85,000.

Defendant's rink was constructed in a building formerly used as an armory and postal service facility. The oval skating area was separated from the "off-skate" area by a concrete block wall 42 inches high. The skating surface consisted of "Temblin" composition boards 1-1/8 inches thick. The boards, coated with an epoxy substance and splined together at the edges, were laid upon a concrete floor. In the off-skate area the concrete was covered by carpet 3/8 inch thick. In the dividing wall were five openings, each nine feet wide, affording skaters access between the two areas. At each opening, the 3/4 inch grade separation between the two floors was covered by a transition ramp. Made of a tempered steel plate, the ramp was nine feet long, 10 inches wide, and 1/8 inch thick. The plate, which was flat when purchased by defendant, was bent along one longitudinal edge to form a lip 7/8 inch wide. Counter-sunk screw holes were bored in this lip. The distances between the holes varied from 13-1/2 inches to 16 inches. The lip was fastened to the top of the Temblin with wood screws and the other longitudinal edge rested upon the carpet. This edge was left unfastened in order to accommodate expansion and contraction of the Temblin.

On April 22, 1974, a private party of 40 to 50 people, including plaintiff, rented defendant's rink for approximately two hours. During that time, plaintiff, who described himself as an

"average skater", had crossed the transition ramps, including the ramp opposite the skate rental room, several times and had experienced no difficulty. While attempting to skate across that ramp to return his rented skates, plaintiff fell and injured his right knee.

## I.

Defendant contends that plaintiff's evidence was not sufficient to raise jury questions concerning negligence and proximate cause. Before reviewing the evidence as a whole, we consider a threshold argument. Defendant argues that the trial court erroneously admitted the testimony of Nancy Kline concerning the condition of the steel plates and certain accidents she and other skaters had suffered.

Kline, a 17-year-old high school student, had used defendant's rink "on an average of about five times a week" for approximately three years after she learned to skate at the age of 12. She testified that she had noticed the steel plates raised above the skating surface, once as high as "maybe a little over a quarter of an inch". "I noticed the plate above the floor most often when I fell over it," she said, "which [as a beginner] I did do several times." "After a while," she continued, "you remember it is there and you learn to step over it." "Several times" she saw other "beginning skaters" fall. Kline described two accidents which she said occurred after she became a "club member" in February 1974. Once, she "saw a lady fall over it [a plate]." "She turned around backwards and fell on her back" and "complained of her leg". Defendant's manager "stayed with her" while "someone in the office called an ambulance." On another occasion, one of her skating companions "fell on the plate" and "scratched her leg"; Kline saw "a screw sitting up out of the plate" and took it to a "floor guard", one of defendant's employees. "He looked at it, shrugged his shoulders, and threw it in the trash can." Kline said that she had never made any complaint directly to the manager because "I didn't feel it my place to tell him how to fix it or how to run this rink".

As below, defendant argues on brief that, for this testimony to be admissible, "it must be relevant in time and be such as reasonably established that the condition on the day in question was substantially the same as described on previous occasions."

We look to the record to determine the purpose for which Kline's testimony was offered and the purpose for which it was admitted. Responding to defendant's objection at trial, plaintiff's counsel said: "The question is . . . notice of the fact and condition to be repaired and corrected . . . not the condition as it existed, but simply notice to management." Holding that it "would be a question that the jury would consider in assessing as to whether they had knowledge or notice of this defect and that they had been negligent in not taking care of it", the trial court overruled the objection and admitted the testimony.

■ On appeal, the parties agree that evidence of prior accidents is not admissible for the purpose of proving negligence or causation at the time of the accident in issue.

"Evidence of other similar accidents or occurrences, when relevant, is admissible to show that the defendant had notice and actual knowledge of a defective condition; but it is well settled that evidence of prior accidents or occurrences is not admissible and can have no effect in establishing the defendant's knowledge of a danger unless the plaintiff shows that those prior accidents or occurrences happened at substantially the same place and under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue, or by the acts of the same person. [Citations omitted]." *Spurlin, Administratrix* v. *Richardson*, 203 Va. 984, 989, 128 S.E.2d 273, 277 (1962).[1]

This rule springs from the lessons of human experience that similar causes can be expected to produce similar effects. By definition, the test of admissibility is not *identity* but *substantial similarity*. If the place, the circumstances, and the defect associated with a prior accident are substantially the same as those in issue, evidence of that accident is admissible to

---

[1]*See also Powhatan L. Co.* v. *Whetzel*, 118 Va. 161, 171, 86 S.E. 898, 902 (1915), where we said that evidence of other accidents resulting from the defective condition of a trestle was properly admitted "to charge the defendant, whose superintendent knew of them, with knowledge of that condition", and *City of Portsmouth* v. *Cilumbrello*, 204 Va. 11, 16, 129 S.E.2d 31, 34 (1963), where we approved such evidence "to show that the city knew, or in the exercise of reasonable care, should have known, that a dangerous condition existed on one of its streets". Compare *Moore* v. *City of Richmond*, 85 Va. 538, 8 S.E. 387 (1888), where evidence of a prior accident, irrelevant to the question of notice and offered only "for the purpose of proving the defective condition of the sidewalk", was properly excluded.

show notice of the existence of the defect and notice of its dangerous potential.

We believe the facts and circumstances described by Kline meet the test of substantial similarity. Like the accident in issue, the accidents she witnessed occurred at defendant's rink and involved skaters who fell over steel transition plates. It is true that Kline did not state that all of the falls occurred on the same ramp where plaintiff fell. Yet, as will appear in more detail later in our opinion, the testimony of defendant's manager had established earlier that the five plates were made of identical material, were designed in identical fashion, and were installed in the same manner, and that the screws by which they were fastened repeatedly worked loose and had to be replaced.[2]

Defendant argues that the accidents Kline described were not "relevant in time" to plaintiff's accident. While Kline's testimony did not fix the exact times of the two accidents involving injuries, she said that they occurred after she became a club member in February 1974. Through its manager and its floor guard, defendant had actual knowledge of those two accidents but chose to offer no evidence to show that they occurred after the date of plaintiff's accident. Considering the inference this raises and reading Kline's testimony as a whole, we believe the jury was entitled to conclude that these two accidents occurred some time after February 1974 and before April 22, 1974, the date of plaintiff's injury. In that time frame, they were clearly relevant to the question of notice of a dangerous condition. The other accidents Kline described occurred while she was still a "beginner", and defendant contends that they were too remote to be relevant. It has been held that remoteness goes to the weight of the evidence rather than to its admissibility. *Lake Shore & M.S.R. Co. v. Beall*, 13 Ohio C.C.R. 605, 6 Ohio C. Dec. 250 *aff'd without opinion*, 53 Ohio St. 674, 44 N.E. 1144 (1895). In Virginia, remoteness of defective conditions goes to the question of admissibility, and that question is left to the sound discretion of the trial court. *Shenandoah Valley, &c. Co. v. Murray*, 120 Va. 563, 579-80, 91

---

[2] *See Sears, Roebuck & Co. v. Copeland*, 110 F.2d 947 (4th Cir. 1940), where the plaintiff, injured in a fall on a step with a defective metal edge strip, offered evidence of a fall by another customer on the same stairway 18 months earlier. There, the court held that it was not "material that the plaintiff failed to show that the same step was involved in both accidents." *Id.* at 949.

S.E. 740, 745 (1917). The same rule applies, of course, to evidence of prior accidents offered to show notice that a defect is potentially dangerous.

As we have said, Kline's testimony concerning defective conditions and prior accidents was offered and admitted only for the purpose of showing such notice. Upon timely request, defendant would have been entitled to a cautionary instruction admonishing the jury that her testimony was not competent to prove negligence or causation at the time of plaintiff's accident. No such request was made, and we hold that the trial court did not abuse its discretion in admitting the testimony.

## II (a)

We consider now whether the evidence as a whole was sufficient to raise jury questions concerning negligence and proximate cause.

 The owner of premises is not an insurer of an invitee's safety, but he owes the invitee the duty to use ordinary care to maintain the premises in a reasonably safe condition, and, unless a dangerous condition is open and obvious, the invitee has the right to assume that the premises are in such condition. *Culpepper* v. *Neff*, 204 Va. 800, 804-05, 134 S.E.2d 315, 318-19 (1964). To recover against the owner, an injured invitee must show that the owner had knowledge, actual or constructive, that a defect existed and that such defect created an unsafe condition.

> "[I]n order to hold the owner of property liable for injuries sustained by an invitee due to the unsafe condition of the premises, it must be shown that the owner had knowledge of the alleged unsafe condition, or that it had existed for such a length of time as to make it the owner's duty in the exercise of ordinary care to have discovered it. [Citations omitted]." *Cannon* v. *Clarke*, 209 Va. 708, 712, 167 S.E.2d 352, 355 (1969).

 We are of opinion that the evidence was sufficient to charge defendant with notice of a structural defect which, even though repaired periodically, continued to cause an unsafe condition of the premises. Benny Jones, defendant's manager, charged with sole responsibility for inspection and maintenance, described his experience with the steel plates. The plates, which he said were installed in all five ramps in the same manner, were "checked weekly" and "also spot-checked". He explained

that "[t]he screws can vibrate up" and "[t]hey do come loose", but "the plate itself is still flat on the floor." When screws worked loose and the holes became enlarged, Jones replaced them with larger screws. He never found it necessary to kneel down to detect loose screws because the "the screw heads are large enough to be able to see them from a standing height." Although he testified that he had never seen a plate raised above the floor, he acknowledged that, from pictures taken several weeks after plaintiff's accident,[3] the plate where plaintiff fell "appears to be raised". Jones, who was not present when the pictures were taken but had been at the rink that day, said that the plates were in proper place. On cross-examination, he agreed that "a raised surface of a quarter inch or more [could] present a danger to the wheels and the skater". It would be "the same thing", he said, as driving "your automobile over a curbing."

In connection with the testimony of Louis Quinton, Jr., defendant's president, defendant introduced as an exhibit the steel plate over which plaintiff fell. Standing on the plate, Quinton lifted one section and released it. His purpose was "to demonstrate in pulling that plate up that as long as there is one screw holding that plate down, any place on that plate, that that plate will fall right back into place". On cross-examination, plaintiff's counsel called Quinton's attention to the fact that, while the "east end" of the plate was flat on the floor, there was a bend at the "west end" and another bend under which he could "almost put [his] little finger". Asked if the plate would rise "if the screw was taken out at that point", Quinton replied that "[i]t would." Quinton indicated three places on the lip of the plate where it had become necessary to bore new holes for additional screws.

The fact that defendant periodically discovered and replaced loose screws and installed additional screws shows not only that defendant was aware of a defective condition and the recurring nature of that condition but also that defendant recognized the hazardous potential of the defect. While it may be that defendant was unaware of all the several accidents described by Kline, defendant's agents had actual knowledge of two accidents, one of which resulted in injuries so severe as to require the use of an ambulance.

---

[3] Defendant objected to admission of the pictures but assigned no error to the trial court's ruling, and we will not notice the point argued on brief. Rule 5:21.

■ Having actual knowledge of a defect and at least constructive notice that, even though periodically repaired, that defect caused a recurring dangerous condition, defendant owed a duty to plaintiff, who was unaware of such condition, to issue an appropriate warning and a duty to take the steps reasonably necessary to remedy the defect which caused that condition. No warning was issued and, although a civil engineer, testifying as an expert, suggested several alternative methods of modifying and installing the steel plates, methods which he said were functionally effective and economically feasible, defendant was content to make temporary repairs which experience had demonstrated were inadequate to prevent a recurrence of the dangerous condition. We believe the jury was entitled to find that defendant violated the duties it owed its invitees.

## II (b)

■ Negligence is actionable only when it constitutes a proximate cause of the accident. Neither contributory negligence nor assumption of risk is in issue here.

Plaintiff testified that he "had slowed down and was pushing off the floor onto the outside." As he reached the "west end" of the ramp, he felt his right foot "hit against something". His left foot went forward, his right leg went "backwards somewhat", and he fell backwards with his right knee bent under him. After the fall, his left thigh was "over the plate", his head was "on the skating area", and his right leg was adjacent to his buttocks. Looking to see what caused his fall, he "saw this metal plate, a big space between the metal plate and the floor" at a point "on the west end of the plate." Jones testified that, when he came to his assistance, plaintiff told him that "he tripped over the plate and fell."

As defendant points out, plaintiff had crossed this plate several times during the evening without experiencing any difficulty. This does not, however, contradict his statement that the plate was raised when he fell. The evidence showed that the screws worked loose gradually, and the jury could have believed that they remained secure until just before plaintiff attempted the last crossing. Moreover, the two bends in the plate were located at or near its west end where plaintiff attempted that crossing, and it would be fair to infer that his earlier crossings had been made elsewhere on the nine-foot plate.

We hold that the evidence was sufficient to support a factual finding that defendant had notice of a defect which it had reason to know created a recurring dangerous condition; that defendant failed to use ordinary care to remedy the cause of the condition or to warn plaintiff of its existence; and that the dangerous condition was the sole proximate cause of plaintiff's accident.

### III

■ The trial court erred, defendant contends, in refusing its Instruction J. That instruction told the jury "to find for the defendant" if they believed "that the exit ramp in question was in reasonably safe condition . . . for the period of approximately two hours prior to the plaintiff falling and that the defendant did not know, nor in the exercise of reasonable care should have known of any change . . . which made it unsafe". The instruction misstates the law as applied to the circumstances in this case. If defendant knew of an underlying defect which had a history of causing a dangerous condition to recur, the fact that such condition may have been dormant for a period of two hours was immaterial to the determination of liability, and the trial court properly refused the instruction.

### IV

■ Finally, defendant says that there was no evidence to show causal connection between the accident and permanent disability, and that the trial court erred in refusing an instruction which told the jury not to consider permanent disability as an element of damages.

Plaintiff, 32 years old at the time of the accident and in excellent physical condition, was employed as a tennis and football coach at the local high school. An outstanding athlete in college and high school, he had participated actively in both sports. Prior to his fall, he had sustained no injury "more serious than a sprained ankle."

The injury from his fall caused plaintiff's knee to become "locked" at a "45-degree angle". Dr. Wieman H. Kretz, an orthopedic surgeon, testified that plaintiff had told him that he "had hung the skate up, wrenched the knee around . . . and his foot was held by whatever held it". When the knee could not be straightened after three days in traction, Kretz performed an

operation in which he found that "the cartilage was torn loose completely from the front" and was "flipped over to itself and was lying doubled up". The damaged cartilage was removed and Kretz prescribed a program of exercise designed to rehabilitate the damaged ligaments and weakened muscles.

In August or September after plaintiff resumed his duties as football coach, he complained of "a catching in his knee" and pain in his hip. Kretz administered conservative treatment, but plaintiff "never could get the knee back to full bend." At the time of trial, Kretz had concluded that "he has got a little piece of cartilage in there which I couldn't see the first time" and had scheduled a second operation for the following month.

Kretz assessed plaintiff's permanent disability at the time of trial at 25 percent and estimated that it would be 10 percent after the second operation had been performed. "No joint that has been opened and had a cartilage taken out is ever a normal joint again," he said.

It is true, as defendant says, that Kretz never formally pronounced that plaintiff's residual disability was the proximate result of the injury he sustained in the fall. Yet, his testimony, detailing a sequential chain of cause and effect, is the substantive equivalent of such a pronouncement. The injury Kretz treated, the injury about which he testified, and the only knee injury plaintiff had ever sustained, was the result of the accident plaintiff described to him. The operation Kretz performed was the result of that injury. The "little piece of cartilage" left in the knee was the result of the operation. Plaintiff's subsequent inability to "get the knee back to full bend" was the result of that little piece of cartilage. And no knee on which such an operation has been performed "is ever a normal joint again".

Suggesting a break in this chain of cause and effect, defendant argues that plaintiff's disability may have been the result of an "intervening cause", i.e., "Mr. Smith returning to work and resuming duties as a football coach." But exercise was part of the prescribed therapy, and the symptoms plaintiff suffered when he attempted to do what he once did without difficulty only confirmed the factuality of his residual disability. Even if his coaching activities aggravated his condition and increased the degree of his disability, the extent to which each cause may have contributed to the quantum of disability was a factual

question to be determined from all the evidence. We hold, therefore, that the trial court did not err in permitting the jury to consider the question of permanent disability as an element of damages.

We find no error in the court below, and the judgment will be affirmed.

*Affirmed.*