726 S.E.2d 302 (2012)
284 Va. 214
Steven K. FUNKHOUSER, Administrator of the Estate of Emily N. Funkhouser, Deceased
v.
FORD MOTOR COMPANY, et al.
Record No. 111207.
Supreme Court of Virginia.
June 7, 2012.
*304 M. Bryan Slaughter, Charlottesville, (J. Gregory Webb, Charlottesville; E. Kyle McNew; MichieHamlett, on briefs), for appellant.
J. Tracy Walker, IV (Perry W. Miles, IV; Derek H. Swanson; McGuireWoods, on brief), Richmond, for appellees.
Amicus Curiae: Virginia Trial Lawyers Association (William W.C. Harty; Patten, Wornom, Hatten, Diamonstein, on brief), Newport News, in support of appellant.
Amicus Curiae: Product Liability Advisory Council, Inc. (Eric C. Tew; Hugh F. Young, Jr.; Dykema Gossett, on brief), in support of appellees.
Present: All the Justices.
Opinion by Justice ELIZABETH A. McCLANAHAN.
Steven Funkhouser, Administrator of the Estate of Emily N. Funkhouser, Deceased, brought this products liability action against Ford Motor Company and Obaugh Ford, Inc. (collectively "Ford") after his daughter, Emily, died from severe burns she suffered when the family's Ford Windstar minivan caught fire. Funkhouser assigns error to the circuit court's order excluding evidence of seven previous Ford Windstar van fires, including "as a predicate for the testimony of [Funkhouser's] expert witnesses." We hold the circuit court erred in its application of Virginia law governing admissibility of other similar occurrences and in excluding evidence of four of the other Windstar van fires. However, we hold the evidence of three of the Windstar van fires was inadmissible, and therefore, Funkhouser's expert witnesses cannot refer to those fires during their direct testimony.

I. Facts and Proceedings Below
On May 4, 2006, three-year old Emily was inside her parents' 2001 Ford Windstar minivan, parked in the driveway of their home, when a fire erupted within the vehicle. Emily suffered third degree burns over 80% of her body and later died at the University of Virginia Hospital.[1] At the time of the fire, the minivan's engine was not in operation, and there was no key in the ignition.[2] Funkhouser *305 filed a complaint asserting that Ford's negligence and breach of implied warranties proximately caused Emily's death. Funkhouser contends the fire was electrical in nature and originated in the dash unit of the minivan. His theory of liability is that Ford knew or had reason to know of the dangerous condition of "key-off dash area electrical fires" but failed to warn Funkhouser of this danger.[3] Ford theorizes that one of the children accidentally started the fire while playing with the cigarette lighter.

A. Cause and Origin of Funkhouser Fire
Funkhouser designated Michael J. Schulz as an expert in fire investigation to testify regarding the cause and origin of the Funkhouser fire. Specifically, Schulz would testify that the origin of the fire "was located within the vehicle's instrument panel area with the key in an off position" and "[a]lthough there are multiple options within the instrument panel and surrounding area that could explain the electrical fire, the most likely origin point of the fire was in the lower portion of the panel in the vicinity of the wiring harness, cigarette lighter and the controls for the heating and AC system." According to Schulz, the cause of the fire was the ignition of combustible materials[4] "by heat energy generated by abnormal and undesired electrical activity within the lower portion of the center instrument panel in the vicinity of the wiring harness, cigarette lighter and the controls for the vehicle's heating and air conditioning system. Further, the source of ignition was likely electrical activity emanating from one of the wires or connector in this vicinity."[5] Schulz opines that "[t]here were no actions by the occupants" of the minivan that "served as the source of ignition." Additionally, Schulz would testify that other similar occurrences "should have placed" Ford on notice that Ford's Windstar minivans manufactured between 1999 and 2003 were or were likely to be dangerous for the use for which they were sold because Ford knew or should have known that the electrical components in the instrument panel area of these vans had the potential to fail and result in a fire with the key in an "`off' position."

B. Evidence of Other Windstar Van Fires
Funkhouser alleges that seven other Ford Windstar van fires of which Ford had knowledge prior to the Funkhouser fire placed Ford on notice of the dangerous condition of key-off electrical dashboard fires with regard to its Windstar minivans.[6]

1. Mulkey Fire

A 1999 Windstar LX owned by Newt Mulkey caught fire in 2003 while the van was parked and not in operation. Jerry Carter *306 with TechniFire Services Company investigated the cause and origin of the fire for State Farm Insurance Company, which insured Mulkey. Carter determined the fire "began at the interior driver and center dash area" and "was caused by a failure of the wiring harness conductors and/or adjacent components located at the interior center and driver side dash area." Due to "heavy degradation of the components and wiring conductors at the interior dash area," an exact determination as to a mechanism of failure could not be made. However, other potential causes, including the development of the fire outside the dash area, were eliminated. Ford admitted it had information regarding the Mulkey fire, that the fire allegedly was electrical in nature and originated in the instrument panel assembly area, and that Ford neither conducted an inspection of the Mulkey van nor determined the Mulkey fire was caused by something other than the original electrical wiring or components within the instrument panel assembly area's electrical system.[7]

2. Tirone Fire

A 2003 Windstar SEL owned by Carl and Susan Tirone caught fire in 2004 when the van was parked and not in operation. According to the Tirones, the van had experienced electrical problems prior to the fire. Lee Oliveira, with North Eastern Technical Services, Inc., investigated the cause and origin of the fire for Peerless Insurance Company, which insured the Tirones. Oliveira determined the fire began in the "dashboard area from the center section over to the left side" and was "accidental electrical in nature" as indicated by the "heavily shorted and beaded" wiring harness in the dashboard. Ford admitted it had information regarding the Tirone fire, that the fire allegedly was electrical in nature and originated in the instrument panel assembly area, and that Ford made no determination that the Tirone fire was caused by something other than the original electrical wiring or components within the instrument panel assembly area's electrical system.

3. Arencibia Fire

A 1999 Windstar LX owned by Octavio Arencibia caught fire in 2004 while it was in a dealership service department repair shop. The fire reportedly originated underneath the dash board area, but there is no additional information regarding the cause of the fire or a cause and origin inspection report. Ford admitted it had information regarding the Arencibia fire, that the fire allegedly was electrical in nature and originated in the instrument panel assembly area, and that Ford neither conducted an inspection of the Arencibia van nor determined the Arencibia fire was caused by something other than the original electrical wiring or components within the instrument panel assembly area's electrical system.

4. Bryan Fire

A 1999 Windstar LX owned by Mark Bryan caught fire in 2002 while parked in a driveway. It was reported to Ford that the fire was "caused due to electrical concerns in the dash." There is no additional information regarding the cause of the fire or a cause and origin inspection report. Ford admitted it had information regarding the Bryan fire, that the fire allegedly was electrical in nature and originated in the instrument panel assembly area, and that Ford neither conducted an inspection of the Bryan van nor determined the Bryan fire was caused by something other than the original electrical wiring or components within the instrument panel assembly area's electrical system.

5. Carf Fire

A 1999 Windstar LX owned by Ernie Carf caught fire in 2000 while parked in the owner's shop garage. The van had been experiencing electrical problems and was not in operation at the time of the fire. Charles C. Ney, with Keeler-Webb Associates, investigated the cause and origin of the fire for Southern Pilot Insurance Company, which insured Carf. Ney determined the fire originated "in the area of the dashboard" and "was caused by an electrical malfunction *307 within the dashboard of the minivan." According to Ney, "a more complete precise cause could not be isolated" due to the destruction of the vehicle interior caused by the fire. Furthermore, "there was no evidence to indicate that the subject fire originated in any other area of the subject garage other than the subject minivan." Ford admitted it had information regarding the Carf fire, that the fire allegedly was electrical in nature, originated in the instrument panel assembly area, and was caused by a failure of original electrical wiring or components located in the van's instrument panel assembly area's electrical system.

6. Pell Fire

A 2002 Windstar LX, leased by Robert and Robin Pell, caught fire in 2003 while parked in the Pells' driveway and not in operation. A fire department report states the fire was "up under [the] glove box" and damage was to the dash and console. According to the Pells, they were told by either the fire department or their insurance company that the fire originated in the dashboard area and resulted from an electrical malfunction. There is no additional information regarding the cause of the fire or a cause and origin inspection report. Ford admitted it had information regarding the Pell fire, that the fire allegedly was electrical in nature and originated in the instrument panel assembly area, and that Ford neither conducted an inspection of the Pell van nor determined the Pell fire was caused by something other than the original electrical wiring or components within the instrument panel assembly area's electrical system.

7. Roth Fire

A 1999 Windstar LX, leased by Matthew and Kathleen Roth, caught fire while parked in the Roth's driveway. Tom McNamara, with Hard Facts, investigated the cause and origin of the fire for Liberty Mutual Insurance Company, which insured the Roths. McNamara determined the fire originated "beneath the left end of the instrument panel and behind the instrument cluster" and resulted from "an electrical abnormality localized to the wiring harness of the instrument cluster electronic circuit board." Ford admitted it had information regarding the Roth fire, that the fire allegedly was electrical in nature and originated in the instrument panel assembly area, and that Ford made no determination that the Roth fire was caused by something other than the original electrical wiring or components within the instrument panel assembly area's electrical system.

C. Ford's Motion in Limine to Exclude Evidence of Other Windstar Van Fires
Ford filed a motion in limine to exclude evidence of the seven other Windstar van fires because the fires did not occur under substantially similar circumstances as the Funkhouser fire and were not caused by the same or substantially similar defects and dangers as alleged in the Funkhouser fire. Although the circuit court found the seven other fires occurred under substantially similar circumstances as the Funkhouser fire since the fires occurred "while the vehicles were stationary and no key was in the ignition," the court concluded the other Windstar van fires were not caused by the same or similar defects and dangers as those alleged to have caused the Funkhouser fire. Specifically, the circuit court reasoned "that the Funkhouser defect has to be identified with specificity to charge Ford with actual notice of that defect, which it had knowledge of by specific defects identified in the seven fires." Finding "[t]he exact defect is not known in the Funkhouser fires," the court concluded "it is not fair to Ford to say it is the `same or similar defect and danger'" as noted in the other fires and "there is not enough specificity noted in the seven fires to say what the defect was that Ford had to warn of or correct." Therefore, the circuit court ruled evidence of the seven other Windstar van fires was inadmissible "for any purpose, including as a predicate for the testimony of [Funkhouser's] expert witnesses."
After the circuit court granted Ford's motion in limine, the parties entered into an agreed final order wherein Funkhouser stipulated, without waiving his objections to the court's ruling excluding the evidence of the other Windstar van fires, that absent evidence of those fires, he would be unable to prove his failure to warn claims, and therefore, *308 entry of summary judgment was proper.

II. Analysis
Funkhouser argues the circuit court erred in ruling the seven other Windstar van fires were inadmissible because it incorrectly applied Virginia law in finding the Funkhouser fire was not identified with sufficient specificity to charge Ford with actual notice. Funkhouser further contends that even if the other Windstar van fires were inadmissible, the circuit court erred in ruling that evidence of such fires could not be used "as a predicate for the testimony" of Funkhouser's expert witnesses. Although we generally review a circuit court's rulings on whether to admit or exclude evidence under an abuse of discretion standard, Funkhouser asserts the circuit court erred in its interpretation and application of Virginia law. Therefore, Funkhouser's arguments present questions of law, which we review de novo. See Jones v. Williams, 280 Va. 635, 638, 701 S.E.2d 405, 406 (2010).

A. Evidence of Other Windstar Van Fires
As we have held, evidence of other similar occurrences is admissible to establish that a defendant had notice and actual knowledge of a defective condition "`provided the prior incident occurred under substantially the same circumstances'" and was "`caused by the same or similar defects and dangers as those in issue.'" Jones v. Ford Motor Co., 263 Va. 237, 255, 559 S.E.2d 592, 601 (2002) (quoting Ford Motor Co. v. Phelps, 239 Va. 272, 276-77, 389 S.E.2d 454, 457 (1990) (quoting General Motors Corp. v. Lupica, 237 Va. 516, 521, 379 S.E.2d 311, 314 (1989))); see also Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 137, 413 S.E.2d 630, 635 (1992); Roll `R' Way Rinks, Inc. v. Smith, 218 Va. 321, 325, 237 S.E.2d 157, 160 (1977). Such evidence may only be admitted to prove notice and actual knowledge by the defendant of the defective condition, not corroboration of such condition. Jones, 263 Va. at 255, 559 S.E.2d at 601. Thus, upon a timely request, a defendant will be entitled to a cautionary instruction informing the jury of this limited purpose. Roll `R' Way Rinks, 218 Va. at 327, 237 S.E.2d at 161.
Because Funkhouser's theory against Ford is that Ford failed to warn of the danger of key-off electrical dashboard fires, Funkhouser must prove Ford (a) knew or had reason to know that the Funkhouser minivan was or was likely to be dangerous for the use for which it was supplied to Funkhouser, (b) had no reason to believe that Funkhouser would realize the minivan's dangerous condition, and (c) failed to exercise reasonable care to inform Funkhouser of the minivan's dangerous condition or the facts which make it likely to be dangerous. Featherall v. Firestone Tire & Rubber Co., 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979) (applying Restatement (Second) of Torts § 388 (1965)). "A product is unreasonably dangerous if it is defective in assembly or manufacture, unreasonably dangerous in design, or unaccompanied by adequate warnings concerning its hazardous properties." Morgen Industries, Inc. v. Vaughan, 252 Va. 60, 65, 471 S.E.2d 489, 492 (1996). Whether the Funkhouser minivan is unreasonably dangerous is a question of fact. Id. In this case, Funkhouser asserts the Windstar minivan supplied to it by Ford was unreasonably dangerous because it was unaccompanied by adequate warnings concerning the potential for key-off electrical dashboard fires. Accordingly, since Funkhouser does not assert that his minivan was defectively manufactured or designed, the specific mechanical cause of the Funkhouser minivan fire is not an element of his failure to warn claim. Rather, Funkhouser must establish the Funkhouser minivan was unreasonably dangerous for its intended use.
We have found evidence of prior similar occurrences admissible to prove notice of a dangerous condition in the context of a products liability action in which the plaintiff alleges a breach of the manufacturer's duty to warn of its product's dangerous condition. In Owens-Corning, we held that evidence of a summary of 44 workers' compensation claims filed by installers of insulation materials alleging they acquired lung diseases caused by exposure to asbestos dust was admissible in an action alleging Owens-Corning failed to warn of the dangers associated with use of insulation products containing *309 asbestos. 243 Va. at 137, 413 S.E.2d at 635-36. As we concluded, the summary of workers' compensation claims was admissible to prove that "Owens-Corning had notice that insulators were at risk of contracting lung diseases from the use of insulation products which contained asbestos." Id.
As our analysis in Owens-Corning indicates, in determining whether other occurrences are caused by the same or similar defects and dangers, the terms "defects" and "dangers" are necessarily interchangeable in the context of a failure to warn claim since liability is based on the manufacturer's duty to warn "if it knows or has reason to know that its product is dangerous." Id. at 134, 413 S.E.2d at 634. The "substantial similarity" test was satisfied in Owens-Corning because the insulators in the workers' compensation claims alleged "they acquired lung diseases caused by exposure to asbestos dust while using insulation products," which was the same or similar dangers claimed by plaintiff. Id. at 137, 413 S.E.2d at 636.
In granting Ford's motion to exclude evidence of the other Windstar van fires, the circuit court improperly applied Virginia law governing admissibility of other similar occurrences. As an initial matter, the circuit court erred in framing the issue before it as whether Ford should be charged with notice and knowledge of a defective condition requiring warning of that condition. Although the circuit court found the other Windstar van fires occurred under substantially the same circumstances because the vans were stationary and no key was in the ignition, the court concluded that the specific defect alleged to have caused the Funkhouser fire was not described with sufficient specificity to show the other Windstar van fires were caused by the same or similar defects and dangers as the Funkhouser fire. In particular, the circuit court stated that "[t]he legal issue here is whether Ford should be charged with notice and actual knowledge of a defective condition requiring the warning of that defective condition." (Emphasis by court.) Ruling that the Funkhouser defect must be "identified with specificity to charge Ford with actual notice of that defect," the court concluded the required specificity was absent such that it was "not fair" to charge Ford with notice of a defective condition. The issue before the court, however, was whether the other Windstar van fires occurred "under substantially the same circumstances" and were caused by "the same or similar defects and dangers" as those alleged in the Funkhouser fire. Jones, 263 Va. at 255, 559 S.E.2d at 601 (internal quotation marks and citation omitted). The defect and danger alleged by Funkhouser is the potential for key-off electrical dashboard fires. Whether the Funkhouser minivan is unreasonably dangerous and whether Ford knew or should have known of the unreasonably dangerous condition are essential elements of Funkhouser's failure to warn claim and were not proper issues for the court to resolve on Ford's motion to exclude evidence of the other Windstar van fires.[8]
Moreover, in reasoning that the defects and dangers asserted by Funkhouser must be identified with the same level of specificity as those in Jones and Lupica, the circuit court applied erroneous legal principles and failed to give due regard to the distinctions between the theories advanced by plaintiffs in Jones and Lupica and the theory asserted by Funkhouser. In Jones, the plaintiff alleged she was injured as a result of a design defect in her vehicle, which made it accelerate without warning when she shifted her car into reverse while her foot was pressing down the brake pedal. Plaintiff's expert testified the vehicle suddenly accelerated due to a defect in the cruise control system that caused a negative transient electrical signal *310 directing the cruise control system to open the throttle. Ford took the position that plaintiff's vehicle suddenly accelerated because she mistakenly pressed the accelerator pedal instead of the brake pedal and offered expert testimony that there were no defects in the cruise control system. Plaintiff sought to introduce the depositions of four individuals who claimed to have experienced sudden acceleration events while operating their vehicles.
We concluded the incidents "occurred under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in the plaintiff's case" since the witnesses "experienced unintended sudden acceleration and none was able to stop his car with the normal application of the brake pedal." Jones, 263 Va. at 255, 559 S.E.2d at 601. Our decision was not based on the specificity of the design defect alleged to have existed in the cruise control system but was based on evidence that the other incidents involved sudden acceleration events in which the witnesses denied controlling the speed of the vehicle such that "all the depositions contain[ed] evidence of a defect in the manufactured automobile." Jones, 263 Va. at 257, 559 S.E.2d at 602. While the defect alleged by the plaintiff in Jones, described as a defect in the electronic cruise control system causing sudden acceleration, was more specific than the defect alleged by Funkhouser, plaintiff's theory in Jones was based on defective design, which necessarily required the identification of the specific design defect. Funkhouser does not advance a defective design theory and is not required to do so in order to introduce evidence of other similar occurrences.[9]
In Lupica, plaintiffs alleged that General Motors negligently designed the power steering system of Lupica's automobile due to the presence of particulate in the steering system. The circuit court permitted the introduction of exhibits containing evidence that other persons claimed to have experienced difficulty with General Motors' power steering systems because of the presence of particulate in the system. We held that most of the exhibits met the "substantial similarity" test for admission of other similar occurrences because such evidence contained statements of occurrences where the power steering on a General Motors vehicle malfunctioned due to particulate in the system. Lupica, 237 Va. at 521, 379 S.E.2d at 314.[10] As in Jones, the defect in Lupica was identified with specificity because the plaintiffs claimed General Motors negligently designed the power steering system of Lupica's vehicle.
In applying the legal principles governing admissibility of prior similar occurrences as discussed herein, we find the Mulkey, Tirone, Carf, and Roth fires "occurred under substantially the same circumstances" and were "caused by the same or similar defects and dangers as those in [the Funkhouser fire]." Jones, 263 Va. at 255, 559 S.E.2d at 601. All four fires occurred when the vans were parked, not in operation, and with no key in the ignition. The cause and origin of each of the fires was professionally investigated and determined to be electrical in nature, to have originated in the dashboard area of the vans, and to have been caused by the failure of electrical wiring or components within the dashboard area. The information regarding these fires contains no *311 evidence of arson, misuse or some external cause for the fires. Since Funkhouser claims that his minivan was unreasonably dangerous for its intended use due to the danger of key-off electrical dashboard fires, evidence of these four Windstar van fires is admissible to prove Ford had notice and actual knowledge of the danger of key-off electrical dashboard fires.
With regard to the Arencibia, Bryan, and Pell fires, however, we hold the evidence regarding these fires does not sufficiently establish that they were caused by the same or similar defect and danger as that alleged in the Funkhouser fire. While these fires occurred when the vans were not in operation and with no key in the ignition, there is no evidence of any investigation into the cause or origin of these fires. Absent sufficient evidence that these fires were caused by faulty electrical wiring in the dashboard area, we cannot conclude that they were caused by the same or similar defects and dangers as the Funkhouser fire.

B. Reference to Other Windstar Van Fires by Funkhouser's Experts
Funkhouser also contends the circuit court erred in ruling that evidence of other Windstar van fires was inadmissible "as a predicate for the testimony" of his expert witnesses. Funkhouser's experts would testify "on what the industry standard would be in response to at least seven reports of unexplained, key-off fires." As stated previously, Schulz is of the opinion that other similar occurrences "should have placed" Ford on notice that Ford's Windstar minivans manufactured between 1999 and 2003 were or were likely to be dangerous for the use for which they were sold because Ford knew or should have known that the electrical components in the instrument panel area of these vans had the potential to fail and result in a fire with the key in an "`off' position."
Pursuant to Code § 8.01-401.1, "any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify." Furthermore, "[t]he facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence." Id. However, this statute does not allow for introduction of otherwise inadmissible evidence during direct examination of an expert witness merely because the expert relied on such evidence in formulating an opinion. See Commonwealth v. Wynn, 277 Va. 92, 100, 671 S.E.2d 137, 141 (2009). In Jones, after finding the circuit court properly excluded from trial evidence of the Updegrove Study, we held that plaintiff's expert witness could not "testify about the Updegrove Study" at trial. 263 Va. at 257, 559 S.E.2d at 602. Likewise, since we find that evidence of the Arencibia, Bryan, and Pell fires is inadmissible at trial, we further hold that Funkhouser's expert witnesses may not testify about or refer to those fires during their direct testimony at trial.
Although Funkhouser's expert witnesses may not make reference to the Arencibia, Bryan, and Pell fires during their direct examination, Code § 8.01-401.1 expressly permits expert witnesses to rely upon inadmissible information in formulating their opinions if it is "of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences." Thus, to the extent the circuit court's ruling purports to prohibit Funkhouser's experts from relying upon other Windstar van fires in formulating their opinions, the circuit court's ruling is inconsistent with the language of Code § 8.01-401.1.[11] Of course, Ford is entitled to cross-examine *312 Funkhouser's experts at trial as to the basis for each opinion, including whether, in formulating such opinion, the expert relied on occurrences not shown to be substantially similar to the Funkhouser fire. See id. (providing that the expert may be "required to disclose the underlying facts or data on cross-examination").[12]

III. Conclusion
For the foregoing reasons, we conclude the circuit court erred in its application of the legal principles governing the admission of the other Ford Windstar van fires and in excluding evidence of the Mulkey, Tirone, Carf, and Roth fires. The circuit court did not, however, err in excluding evidence of the Arencibia, Bryan, and Pell fires. Evidence regarding those fires is not admissible at trial and may not be referred to by Funkhouser's experts during their direct examination. This ruling does not preclude Funkhouser's experts from relying upon information regarding the Arencibia, Bryan, and Pell fires in formulating their opinions provided such information is "of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences." Code § 8.01-401.1.
Since summary judgment was entered upon stipulation by the parties as a result of the circuit court's evidentiary rulings, some of which we have found were made in error, we will reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.
Reversed and remanded.
Justice POWELL, with whom Chief Justice Kinser and Justice Goodwyn Join, dissenting.
As the majority correctly states, the actual issue before the circuit court was "whether the other Windstar fires occurred `under substantially the same circumstances' and were caused by `the same or similar defects and dangers' as those alleged in the Funkhouser fire." The majority, however, falls into the same flawed analysis as Funkhouser and attempts to address both parts of the substantial similarity test with the same evidence. Therefore, I must respectfully dissent.
We have recognized that, to establish notice and actual knowledge in a duty to warn case, one may present evidence of similar occurrences, provided the prior incident occurred "`under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue.'" General Motors Corp. v. Lupica, 237 Va. 516, 521, 379 S.E.2d 311, 314 (1989) (quoting Spurlin v. Richardson, 203 Va. 984, 989, 128 S.E.2d 273, 277 (1962)).
Under the facts of this case, all Funkhouser can show is that the fires occurred under substantially the same circumstances, i.e. a key-off electrical fire originating in the dashboard; he cannot show that the fires were caused by the same or similar defects and dangers. Indeed, the evolution of Funkhouser's claims in this case demonstrates this fact. Funkhouser amended his initial complaint, which asserted a design defect claim, in order to substitute a failure to warn cause of action because he realized that he could not definitively prove that the fire in his Windstar was caused by a faulty cigarette lighter. Similarly, he cannot prove the cause of the fires in the other vehicles, as is evident from the majority's own detailed description of the uncertain causation of the other events: Mulkey (an exact determination as to a mechanism of failure could not be made); *313 Tirone (fire originated in the left side of the dashboard area); Carf (fire originated within the dashboard); Roth (fire originated somewhere in the instrument panel).[1]
Furthermore, I believe that the majority's reliance on Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 413 S.E.2d 630 (1992), is misplaced. Owens-Corning involved an appeal of the trial court's decision to allow a summary of other claims without requiring proof of substantial similarity. We held that the substantial similarity test was satisfied because an Owens-Corning vice-president had testified that he was aware of the previous claims and that the claimants alleged they acquired lung diseases due to exposure to asbestos dust. Id. at 137, 413 S.E.2d at 636. Therefore, it was clear that Owens-Corning already had actual notice of the risk of contracting lung diseases from the installation of products containing asbestos.
The test of substantial similarity requires, in part, that the other incidents be caused by the same or similar defects and dangers as those at issue. Because Funkhouser cannot show what defect caused the fire in his Windstar, he necessarily cannot show that the defect in the other Windstars were similar.[2] Even if he could pinpoint the defect that caused the fire in his Windstar, the evidence regarding the cause of all seven of the other fires is inconclusive. Accordingly, I would affirm the decision of the trial court on all issues.
NOTES
[1] Emily's twin brother, Evan, was also in the minivan and survived the fire. He sustained injuries from exposure to heat and smoke.
[2] Prior to the fire, Emily and Evan were playing inside their home and went outside to the front porch while their mother, Deborah Funkhouser, was on the telephone. Deborah told the children to stay on the porch, took a few minutes to finish her telephone call, and retrieved her shoes to go outside. As she proceeded toward the front door, she saw through a window that the minivan was filled with smoke, which was also seeping from the passenger side door. Deborah ran outside, opened the passenger side door and found Emily sitting in the passenger seat and Evan standing in the driver's seat holding on to the steering wheel.
[3] Funkhouser filed a previous complaint against Ford asserting the fire resulted from a faulty electrical connection at the rear of the cigarette lighter socket. The circuit court granted Ford's motion in limine to exclude evidence of other Ford Windstar minivan fires finding that none of those fires were caused by the same defect alleged by Funkhouser. After the court granted the motion in limine, Funkhouser took a voluntary nonsuit and filed the present action. Funkhouser is no longer asserting the fire resulted from any specific manufacturing or design defect but is proceeding on the theory that Ford failed to warn of the danger of key-off electrical dashboard fires.
[4] Schultz identifies the combustible materials as "electrical wiring insulation, plastic wire ties, plastic electrical connectors, and other plastic materials" in addition to the "combustible housing and construction of the center instrument panel itself," all of which "served as fuel sources for the hostile fire incident."
[5] Schulz would also testify that the source of ignition of the fire was not the portable compact disc player lying on the front floor of the minivan, its power supply adapter, or the cellular phone charger assembly located in the passenger compartment.
[6] The information regarding the other fires was contained in reports produced by Ford in the course of discovery during the pendency of Funkhouser's first action. The parties agreed that all pleadings and submissions filed or otherwise made part of the record in the first action would become part of the record in the present action in connection with Ford's motion in limine to exclude evidence of other Windstar van fires.
[7] Ford did not admit that the Mulkey fire or any of the other Windstar van fires were caused by the same or similar defect alleged to have caused the Funkhouser fire and made no admissions regarding the actual cause of the Mulkey or other Windstar van fires.
[8] Furthermore, in ruling the Funkhouser defect must be "identified with specificity to charge Ford with actual notice of that defect," the circuit court required Funkhouser to provide a level of specificity not required for Funkhouser's failure to warn claim. Funkhouser is asserting that the minivan was unreasonably dangerous due to the potential for key-off electrical dashboard fires, not due to a specific design or manufacturing defect. Thus, the issue presented by Ford's motion to exclude evidence of the other Windstar van fires was whether the other fires were caused by key-off electrical dashboard fires. See Owens-Corning, 243 Va. at 137, 413 S.E.2d at 636. Funkhouser was not required to allege a specific mechanical defect to establish the similarity of the fires.
[9] Although we held the depositions of the four individuals who experienced sudden acceleration events were admissible, we found the circuit court properly excluded a study, commissioned by Ford, of customer complaints of unintended acceleration incidents in various vehicles manufactured by Ford. This study, referred to as the "Updegrove Study," contained a categorization of events, some of which were classified as caused by operator error, some of which were classified as caused by mechanical malfunction, and the majority of which were unexplained. There was no evidence that the 2,900 claims occurred under the substantially same circumstances as plaintiff's incident and had been caused by the same or similar defects and dangers. Jones at 257, 559 S.E.2d at 602.
[10] We found one exhibit, a newspaper article discussing defects in power steering systems manufactured by General Motors, inadmissible because it did not identify specific occurrences. We also found inadmissible certain exhibits consisting of preliminary investigations of accidents involving General Motors vehicles still under their warranty where those investigations revealed no defect in the steering system as a cause of the accidents. Lupica, 237 Va. at 521-22, 379 S.E.2d at 314-15.
[11] Although the scope of the circuit court's ruling is not clear from its order, the language used by the court appears to have been based on this Court's language in Jones wherein we stated that the plaintiff's expert could not use the Updegrove Study as a "predicate" for his opinions at trial. 263 Va. at 257, 559 S.E.2d at 602. In Jones, however, we did not address whether the plaintiff's expert could rely upon the Updegrove Study in formulating his opinion or otherwise discuss an expert's reliance upon inadmissible information under Code § 8.01-401.1.
[12] As with all expert opinion testimony, "such opinion[s] must meet certain standards as a condition precedent to admission into evidence." Blue Ridge Serv. Corp. v. Saxon Shoes, Inc., 271 Va. 206, 213, 624 S.E.2d 55, 59 (2006). "`Expert testimony . . . cannot be speculative or founded upon assumptions that have an insufficient factual basis.'" Id. (quoting Tittsworth v. Robinson, 252 Va. 151, 154, 475 S.E.2d 261, 263 (1996)). "`[E]xpert testimony founded upon assumptions that have no basis in fact is not merely subject to refutation by cross-examination or by counter-experts; it is inadmissible.'" Norfolk Southern Railway Co. v. Rogers, 270 Va. 468, 479, 621 S.E.2d 59, 65 (2005) (quoting Vasquez v. Mabini, 269 Va. 155, 160, 606 S.E.2d 809, 811 (2005)). Since the circuit court ruled, in limine, that Funkhouser's experts could not use the other Windstar van fires "as a predicate" for their testimony by virtue of its ruling on the admissibility of the other fires as similar occurrences, the sufficiency of the factual basis for any specific expert testimony is not before us.
[1] It should be noted that, in describing each fire, the majority references the fact that Ford either did not inspect the vehicle or made no determination as to the cause of the fire, thus, implying that Ford had some obligation to investigate further. Our jurisprudence makes it clear that Ford was under no such obligation. The standard in Virginia for a failure to warn case is whether Ford "knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied." Featherall v. Firestone Tire & Rubber Co., 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979) (citing Restatement (Second) of Torts § 388). By implying that Ford had an obligation to investigate further, however, the majority applies a "should know" standard.

We have previously explained the differences between the two standards.
Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.
Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 135-36, 413 S.E.2d 630, 635 (1992) (emphasis added).
[2] The majority states that because "Funkhouser does not assert that his minivan was defectively manufactured or designed, the specific mechanical cause of the Funkhouser minivan fire is not an element of his failure to warn claim." Based on that conclusion, the majority then holds that "the issue presented by Ford's motion to exclude evidence of the other Windstar van fires was whether the other fires were caused by key-off electrical dashboard fires." That issue addresses only the portion of the substantial similarity test requiring the prior incidents to have "happened under substantially the same circumstances." Lupica, 237 Va. at 521, 379 S.E.2d at 314 (internal quotation marks omitted). It ignores the additional requirement that the prior incidents were "caused by the same or similar defects and dangers." Id. (internal quotation marks omitted).